Richard R. Thomas, Bar No. 7-5865
SMITH LC
Post Office Box 8729
Jackson, Wyoming 83002
T: 307-201-6000
E: rthomas@smith-lc.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| DANIEL TRUETT NEESE; ALTATUDE 650, LLC, a Wyoming limited liability company; PREMIER WEST BUILDERS, INC., a Texas corporation; SCOTT FIELD; CLARISSA FIELD; and FIELD MINERALS, LLC, a Colorado limited liability company,<br><br>        Plaintiffs,<br><br>    vs.<br><br>LARRY R. MOYER; LARRY R. MOYER EXPLORATION, LLC, a Colorado limited liability company; STEPHEN SMITH; STEPHEN SMITH, INC., a Colorado corporation; GOLDEN CREST II, LLC, a Wyoming limited liability company; JOHN AND JANE DOES 1-20; and BLACK AND WHITE CORPORATIONS 1-20,<br><br>        Defendants. | Case No. |

## COMPLAINT

For their Complaint against Defendants, Plaintiffs allege as follows:

1

I.    **INTRODUCTION**

1.      This case arises from Defendants' fraudulent and extortionate schemes to induce passive investors to invest money in Defendants' oil, gas, and mineral exploration boondoggle, an enterprise Defendants call "the Project." As Plaintiffs describe in more detail below, Defendants have conspired together to manage and operate the Project through a broad and continuing pattern of racketeering activity that includes securities fraud, wire fraud, extortion, and theft.  Plaintiffs bring this case to hold Defendants responsible for their malicious and ongoing fraudulent scheme.

II.    **PARTIES**

**Plaintiffs**

2.      Plaintiff Daniel T. Neese ("Neese") is a resident and citizen of Wyoming.

3.      Plaintiff Altatude 650, LLC ("Altatude") is a Wyoming limited liability company with its principal place of business in Wyoming, in this District. Neese is the sole member and manager of Altatude.

4.      Premier West Builders, Inc. ("Premier") is a Texas corporation with its principal place of business in the state of Texas. Neese is the controlling shareholder of Premier.

5.      Neese, Altatude, and Premier shall be referred to herein as "the Neese parties."

6.      Plaintiff Scott Field and Clarissa Field ("Field") are husband and wife and residents and citizens of the state of Colorado.

7.      Plaintiff Field Minerals, LLC ("Field Minerals") is a Colorado LLC with its

principal place of business in Colorado.

8.     Field and Field Minerals shall be referred to herein as "the Field parties."

9.     The claims of all Plaintiffs herein have arisen from the same series of transactions or occurrences.  Many questions of law and fact are common to all Plaintiffs and will arise and be litigated in this case.  The claims of Plaintiffs are logically related. Therefore, the claims of all Plaintiffs are properly included herein pursuant to *Fed R. Civ. P.* 20(a).

### Defendants

10.     Defendant Larry R. Moyer ("Moyer") is a citizen and resident of Colorado. As alleged herein, Moyer has caused acts and events to occur within the state of Wyoming and this district out of which Plaintiffs' claims arise.  This Court has personal jurisdiction over Moyer.

11.     Defendant Larry R. Moyer Exploration, LLC (""LRME") is a Colorado limited liability company with its principal place of business in Grand Junction, Colorado. As alleged herein, LRME has caused acts and events to occur within the state of Wyoming and this district out of which Plaintiffs' claims arise. Upon information and belief, Plaintiffs allege that Moyer is the sole member of, and otherwise controls, LRME.  At all times relevant hereto, Moyer acted for, on behalf of, and within the scope of his agency for, LRME. LRME is vicariously liable for the acts of Moyer alleged herein. This Court has personal jurisdiction over LRME.

12.     Defendant Stephen Smith ("Smith") is a citizen and resident of Colorado. As alleged herein, Smith has caused acts and events to occur within the state of Wyoming

and this district out of which Plaintiffs' claims arise. This Court has personal jurisdiction over Smith.

13.     Defendant Stephen Smith, Inc. ("SSI") is a Colorado corporation with its principal place of business in Grand Junction, Colorado. As alleged herein, SSI has caused acts and events to occur within the state of Wyoming and this district out of which Plaintiffs' claims arise. Upon information and belief, Plaintiffs allege that Smith is the sole shareholder of, and otherwise controls, SSI. At all times relevant hereto, Smith acted for, on behalf of, and within the scope of his agency for, SSI. SSI is vicariously liable for the acts of Smith alleged herein. This Court has personal jurisdiction over SSI.

14.     Defendant Golden Crest II, LLC ("Golden Crest") is a Wyoming limited liability company with its registered office at 159 N. Wolcott Street, Suite 400, Casper, Wyoming.  Golden Crest was formed on March 23, 2021, for the purpose of conspiring with Smith, Moyer, LRME and SSI in their wrongful conduct, as alleged herein. This Court has personal jurisdiction over Golden Crest.

## III.    JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over Count One pursuant to 15 U.S.C. § 78aa and pursuant to 28 U.S.C. § 1331, inasmuch as Count One arises under 15 U.S.C. § 78j.

16.     This Court has supplemental jurisdiction over all other Counts of this Complaint pursuant to 28 U.S.C. 1367, inasmuch and those Counts are so related to Count One that together they form part of the same case or controversy under Article III of the United States Constitution.

17.     Venue is proper in this district pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).

## IV.     GENERAL FACTUAL ALLEGATIONS

### A.     Smith, Moyer, SSI, and LRME Form a Joint Venture to Pursue Oil, Gas, and Mineral Exploration in the Western United States.

18.     In approximately August of 2016, Smith, Moyer, LRME and SSI agreed to form a common law joint venture ("the joint venture") to pursue oil, gas, and mineral exploration in the western United States. The ostensible purpose of the joint venture was to (a) obtain oil and gas leases and mining claims on federal land in the western United States; (b) identify the areas within the leased land and mining claims with the highest potential for oil drilling and mining success; (c) market and sell or assign those high potential areas and claims to outside third-parties to enable those third-parties to drill successful wells and successfully mine minerals; and (d) retain a financial interest in successful wells and mining claims.

19.     Smith, Moyer, LRME and SSI called the joint venture the "Colorado Plateau & Great Basin Paleozoic Sourced Oil Project" ("the Project").

20.     Smith, Moyer, LRME and SSI organized the Project into two main divisions: (1) oil and gas exploration; and (2) mining exploration.

### Oil and Gas Leases on Federal Land

21.     The oil and gas exploration division of the Project depended upon obtaining and maintaining oil and gas leases on federal land, pursuant to several federal statutes and regulations. The Bureau of Land Management ("BLM") within the United States

Department of the Interior ("DOI") is responsible for leasing oil and gas for development throughout the federal onshore mineral estate.

22.     A person or entity can obtain an oil and gas lease on federal land from the BLM through a quarterly public auction in every state where unleased lands are available, although the process is now available over the internet. Federal law requires a lease to go to the highest bidder in the BLM's auction. However, for a tract of leasable land receiving no minimum bid of $2 per acre, a lease can be granted to anyone who provides a minimum application fee. The term of an oil and gas lease on federal land is generally ten years.  The leaseholder must pay annual rental payments on each acre leased or, if the land is producing oil and/or gas, royalties on such production.

23.     Once it grants a lease to a successful bidder, the BLM issues a formal, written lease.  The lease is an interest in real property and a protectible property interest in the mineral estate covered by the lease.  The lease holder can transfer or assign all or part of its property rights under the lease to someone else. However, to effectuate that transfer or assignment, the lease holder lessor must file the assignment or transfer with the BLM. The assignment must be approved by the BLM.

### Mining Claims on Federal Land

24.     The mining exploration division of the Project depended on obtaining and maintaining mining claims on federal land. Federal law grants U.S. citizens the right to explore for, discover, and claim a possessory right to valuable minerals on certain federal land.  That possessory right is called a "mining claim."

25.     The process for obtaining a mining claim on federal land consists of four

basic steps. First, a person seeking a mining claim must identify the federal land open to mining - land that has not yet been claimed and where mining activity is allowed. Second, that person must visit the land selected and must locate a valuable mineral deposit on that land. Third, that person must "stake" the claim, that is, physically identify it with a physical designation on the land itself. State and federal law governs how that staking should occur. Fourth, that person must properly and timely record the claim and site with the BLM and the county in which the site is located.

26.     Once the person seeking a mining claim has accomplished these four steps, that person has a non-fee protected possessory interest in the land staked and claimed. That possessory right allows the claim holder to develop and extract a mineral deposit.

27.     A person holding a perfected mining claim can transfer or assign all or part of that claim to someone else.  State law governs transferring and assigning mining claims or sites.  However, to transfer or assign a mining claim, the claim holder must also file a notice of transfer with the BLM office in the state where the claim is located.

**B.     Smith, Moyer, LRME and SSI Solicit Passive Investors to Participate in the Joint Venture by Fraudulently Representing That the Participants Would Receive a Fractional Interest in Oil and Gas Leases and Mining Claims.**

28.     In approximately October 2016, Smith, Moyer, LRME and SSI began soliciting members of the public in various states, including Colorado and Wyoming, to be passive "participants" in the Project.

29.     Smith, Moyer, LRME and SSI intended the participants to be the primary source of funding for the Project.

30.     Smith, Moyer, LRME and SSI intended to retain managerial and operational control over all aspects of the Project and intentionally designed the Project so that the participant investors would have no such control.  Indeed, Smith, Moyer, LRME and SSI designed and operated the Project in such a manner that the participant investors would rely entirely upon Smith, Moyer, LRME and SSI for the success of the joint venture.

31.     Defendants solicited participants for the Project using instrumentalities of interstate commerce, including the internet, interstate telephone lines, and the United States mail system.

32.     To persuade members of the public to become participant investors in the Project, Smith, Moyer, LRME and SSI acted in concert to make certain representations to would-be participants.  Smith, Moyer, LRME and SSI jointly represented to would-be participants that, in exchange for a promise to pay a percentage share of expenses of the Project, the participants would be receive two things: (1) a fractional ownership interest in the oil and gas leases or mining claims of the Project; and (2) membership in the joint venture, with concomitant participation in the upside profits of the Project.

33.     The foregoing arrangement constitutes an investment contract and a security under 15 U.S.C. § 77b(a)(1) and section § 11-51-201(17) of the Colorado Securities Act.

34.     The fractional undivided interest in oil and gas leases and mining claims are securities under 15 U.S.C. § 77b(a)(1) and section § 11-51-201(17) of the Colorado Securities Act.

35.      The interest in the joint venture is a security under 15 U.S.C. § 77b(a)(1) and section § 11-51-201(17) of the Colorado Securities Act.

36.     The foregoing securities are unregistered and non-exempt under the Colorado Securities Act.

37.     Smith and Moyer, LRME and SSI neither provided nor required a formal, written agreement for the participant investors.

38.     At all times relevant to this case, the representation by Smith, Moyer, LRME and SSI that participants would receive a fractional ownership interest in the oil and gas leases of the Project ("the fractional interest representation") was and is false.

39.     At all times relevant to this case, Smith, Moyer, LRME, and SSI knew that in order to actually provide a participant with a property ownership interest of a fractional interest in the federal oil and gas leases, a formal assignment of that fractional interest would have to be signed by SSI and/or LRME and then formally filed with the federal Bureau of Land Management ("BLM").

40.     At all times relevant to this case, Smith, Moyer, LRME, and SSI knew that they had no present or future intention, plan to create, execute, or file with the BLM the proper formal assignment of any fractional interest in the federal oil and gas leases of the Project.

41.     Smith, Moyer, LRME and SSI have never provided to any participant in the Project or filed with the BLM a formal assignment or transfer of any fractional interest in any oil and gas lease of the Project.

42.     At all times relevant to this case, the representation by Smith, Moyer, LRME and SSI that participants would receive a fractional ownership interest in the mining claims of the Project was and is false.

43.     At all times relevant to this case, Smith, Moyer, LRME, and SSI knew that in order to actually provide a participant with a property ownership interest of a fractional interest in the mining claims of the Project, a formal assignment of that fractional interest would have to be signed by SSI and/or LRME and then formally filed with the BLM and in the state where the assigned claim is located.

44.     At all times relevant to this case, Smith, Moyer, LRME, and SSI knew that they had no present or future intention, plan to create, execute, or file with the BLM or in any state the proper formal assignment of any fractional interest in the mining claims of the Project.

45.     Smith, Moyer, LRME and SSI have never provided to any participant in the Project or filed with the BLM a formal assignment or transfer of any fractional interest in any oil and gas lease or mining claim of the Project.

46.      At no time during the history of the Project have Smith, Moyer, LRME and SSI ever assigned or transferred to any participant a fractional interest in any oil and gas lease or mining claim of the Project.

47.     Upon information and belief, Plaintiffs allege that, by the end of 2016, Smith, Moyer, LRME and SSI had persuaded at least two passive participant investors to join the joint venture Project.  Smith, Moyer, LRME and SSI channeled the first participants in the Project to the oil and gas exploration division.  By early 2017, Defendants were allowing participants, some of whom were already participants in the oil and gas exploration division, into the mining exploration division.

**C.      Through Fraud, Smith, Moyer, LRME and SSI Persuade the**

**Neese Parties to Participate in the Project.**

48.     On January 26, 2017, acting on behalf of Smith, Moyer, LRME and SSI, Smith spoke with the Neese parties by telephone about the oil and gas division of the Project. During that call, as he, Moyer, SSI, and LRME had done with prior solicitations of participants, Smith represented to the Neese parties that, in exchange for a promise to pay a 1/8th share of expenses of the Project, the Neese parties would be receive two things: (1) a 1/8th fractional ownership interest in the oil and gas leases of the Project; and (2) membership in the joint venture, with concomitant participation in the upside profits of the Project.

49.     As of January 26, 2017, Smith knew that the fractional interest representation he was making to the Neese parties was false.

50.     As of January 26, 2017,  Smith, Moyer, LRME, and SSI knew that in order to actually provide a participant with a property ownership interest of a 1/8th fractional interest in the federal oil and gas leases, a formal assignment of that fractional interest would have to be signed by SSI and/or LRME and then formally filed with the BLM.

51.     As of January 26, 2017, Smith, Moyer, LRME, and SSI knew that, despite their prior fractional interest representations to other Project participants, neither Smith, Moyer, LRME, or SSI had taken any steps to create, execute, or file with the BLM the proper formal assignment of any fractional interest in the federal oil and gas leases of the Project.

52.     Based upon the initial conversation with Smith, the Neese parties reasonably understood and believed that, if they agreed to participate in the Project and pay 1/8th of

the Project's costs, they would become members of the joint venture Project, would obtain ownership of a 1/8th fractional interest in the Project's oil and gas leases on federal land, and could obtain a 1/8th fractional interest in future oil and gas leases.

53.     After the initial telephone call with the Neese parties, Smith and Moyer sent to the Neese parties a three-ring binder ("the promotional binder") in late January 2017. Smith and Moyer sent the promotional brochure to the Neese parties to persuade the Neese parties to participate in the Project. A true and correct copy of the contents of the promotional binder is attached to this Complaint as Exhibit 1 and incorporated herein by reference.

54.     Smith, Moyer, LRME, and SSI jointly created the promotional binder intending that it reflect the fractional interest representation.

55.     Smith, Moyer, LRME and SSI jointly created the promotional binder intending that potential participants in the Project, including the Neese parties, rely on the statements and information contained in it, including the fractional interest representation, to make their decision about whether to participate in the Project.

56.     The promotional binder contains technical maps and diagrams about the prospect for oil exploration in Utah, Wyoming, and Colorado. It also contains narrative descriptions of the opportunity being offered to the Neese parties, including the fractional interest representation.

57.     Based upon the contents of the promotional binder, the Neese parties reasonably understood that, if they agreed to participate in the Project and pay 1/8th of the Project's costs, they would become members of the joint venture Project and would obtain

ownership of a 1/8th fractional interest in the Project's oil and gas leases on federal land. For example, on a document within the promotional binder entitled "Colorado Plateau & Great Basin Paleozoic Sourced Oil Project – ***Land Proposal***" and dated October 12, 2016 ("October 2016 Land Proposal"), Smith, Moyer, LRME and SSI state that they are seeking participants "for the acquisition of oil and gas interests (and possibly interests in other gases or types of minerals)…" (emphasis added).

58.    The October 2016 Land Proposal also states that "[p]articipants (including Smith for 1/8th on the same terms as participants) will pay 100% of the above costs and Smith and Moyer will share an undivided 25% interest in leases, minerals, royalties, or other types of interests acquired."

59.    The October 2016 Land Proposal also includes a "Project Budget." That budget represents that over $200,000 in funds contributed to the Project will be used for "land costs."

60.    The promotional binder also contains a separate "Two Year Estimated Budget" ("Two Year Budget").  The Two Year Budget contains specific line items for "open land filings" and "delay rentals." In a footnote on the Two Year Budget, Smith and Moyer state the following: "The Estimated Budget includes an additional $1,000,000 expenditure for Daily Rentals ($175,000) and Prospects ($875,000), primarily Leasehold Acquisition and other costs, above the Initial  Budget and Federal Filings Expenditures. It is envisioned that Leasehold Acquisition Costs will be the predominant expenditures to acquire Oil and Gas Leases in Geologically Favorable Areas."

61.    In addition, the promotional binder contains a document entitled "Update on

Colorado Plateau and Great Basin Project (11/12/16) ("November 2016 Update"). In the

November 2016 update, Smith, Moyer, LRME and SSI state the following, among other

things:

> We are looking for a commitment for a 1/8th or more share of $500,000 over the two year period (1/8 = $62,500), but with the understanding that **the purpose of the project is to buy leases** and develop prospects on good geologic ideas….

(emphasis added).

62.     The promotional binder also contains a copy of the first page of 36 separate

federal land oil and gas leases.

63.     The Neese parties read and reviewed the promotional binder in late January

2017.

64.     Based on the sections of the promotional binder referred to above, the Neese

parties reasonably understood the promotional binder to confirm the terms of the Neese

parties' participation in the Project as described by Smith in the January 26, 2017,

telephone conversation. In particular, based upon the contents of the promotional binder,

the Neese parties continued to reasonably believe and understand that, if they agreed to

participate in the Project and pay 1/8th of the Project's costs, they would become members

of the joint venture Project and would obtain ownership of a 1/8th fractional interest in the

Project's oil and gas leases on federal land. They also reasonably understood that, if the

Project entered into additional oil and gas leases, the Neese parties would be offered the

opportunity to obtain a 1/8th fractional interest in those additional leases, provided the

Neese parties agreed to take on a proportional 1/8th of the increased costs associated with

those additional leases.

65.     Smith spoke again with the Neese parties by telephone on January 30, 2017.

Following that phone call, on January 30, 2017, Smith wrote an email to Neese, copied to

Moyer, in which Smith stated the following:

> Dan, in accordance with our phone conversation today, it is my
> understanding that Altatude 650, LLC, a Wyoming LLC, wishes to take **a
> 1/8 share of the above project to acquire oil and gas leases on geologic
> ideas in Nevada, Utah and the West one half of Colorado**. The interest
> will be subject to the terms as set forth on the Land Proposal and Budget, a
> copy of which is attached. There are also 8.5 x 11 size write ups of the same,
> for ease of printing.
>
> Also attached is a spreadsheet of a possible expenditure range for a 1/8
> interest, assuming we spend an additional $1,000,000 over and above the
> costs incurred to date and the $500,000 gross budget commitment. Of course
> what we spend will be based on the opportunities we encounter and you will
> be able to opt in or out on a prospect or "buy" area basis.
>
> If you could please respond to this email with your affirmative election to
> take this interest, we will consider you in. Forwarding the email back will
> keep the attachments in place, which is helpful. We hope when we have our
> complete group together to prepare a more formal agreement that would have
> a Joint Operating Agreement  with an Area of Mutual Interest.
>
> Thanks for joining our group. We look forward to working together.

(emphasis added)("January 30, 2017 confirmation email").

66.     The Neese parties reasonably understood and believed that the foregoing

email confirmed Smith's statements in the January 26, 2017 telephone call and the

statements contained in the promotional binder, including the fractional interest

representation.

67.     Based upon the January 30, 2017 confirmation email, the Neese parties

continued to reasonably believe and understand that, if they agreed to participate in the

Project and pay 1/8th of the Project's costs, they would become members of the joint venture project and would obtain ownership of a 1/8th fractional interest in the Project's oil and gas leases on federal land. They also reasonably understood that, if the Project entered into additional oil and gas leases, the Neese parties would be offered the opportunity to obtain a 1/8th fractional interest in those additional leases, provided the Neese parties agreed to take on a proportional 1/8th of the increased costs associated with those additional leases.

68.    As of January 30, 2017, however, Smith, Moyer, LRME, and SSI knew that their fractional interest representation to the Neese parties was false.

69.    Prior to January 30, 2017, Smith, Moyer, LRME, and SSI had made identical fractional interest representations to other persons to induce those persons to become participants in the Project.

70.    Prior to January 30, 2017, Smith, Moyer, LRME, and SSI knew that in order to actually provide a participant with a property ownership interest of a 1/8th fractional interest in the federal oil and gas leases, a formal assignment of that fractional interest would have to be signed by SSI and/or LRME and then formally filed with the federal Bureau of Land Management ("BLM").

71.    Prior to January 30, 2017, Smith, Moyer, LRME, and SSI knew that, despite their prior fractional interest representations to other Project participants, neither Smith, Moyer, LRME, or SSI had taken any steps to create, execute, or file with the BLM the proper formal assignment of any fractional interest in the federal oil and gas leases of the Project.

72.     The fractional interest representation was a material factor in the Neese parties' decision to participate in the Project.

73.     The Neese parties were justifiably unaware of the falsity of the fractional interest representation.

74.     Justifiably relying on the truth of the fractional interest representation, the Neese parties responded to Smith's January 30, 2017 confirmation email and agreed to participate in the Project.

75.     Had the Neese parties known that the fractional interest representation was false, they would never have agreed to participate in the Project.

**D.     Through Fraudulent Monthly Invoices, Smith, Moyer, LRME and SSI Continue to Deceive the Neese Parties Into Making Additional Payments For the Project.**

76.     Once someone had agreed to become a participant in the Project under the foregoing terms, Smith, Moyer, LRME and SSI employed a second, related fraudulent scheme to induce participants to continue to provide funding to the Project. This second, related scheme revolved around the monthly invoice.

77.     Each month, on behalf of Smith, Moyer, LRME and SSI, Moyer and LRME prepare and send out invoices to participants. Each invoice purports to identify the expenses of the Project each participant is responsible for, based upon that participant's percentage interest.

78.     The monthly invoices are based upon the false assumption and false representation that the participant receiving the invoice has a fractional interest in the leases referred to in each invoice.

79.     A fundamental purpose of the monthly invoice was to perpetuate the false fractional interest representation and further deceive participants into believing they had fractional ownership interests in the oil and gas leases of the Project.

80.     Smith, Moyer, LRME and SSI unlawfully coerced participants to pay the monthly invoices by threatening to terminate their interest in the Project, including the participant's fractional ownership interests, if the participant failed to pay amounts shown on the invoices.  Smith, Moyer, LRME and SSI made these threats to maintain, support, and conceal their fraudulent scheme based upon the fraudulent fractional interest representation.  The threats by Smith, Moyer, LRME and SSI constituted threats of economic harm made with the purpose of obtaining money from Project participants. The threats by Smith, Moyer, LRME and SSI put the participants in reasonable fear of economic harm.

81.     The Neese parties received their first invoice after agreeing to participate in the Project on January 30, 2017.

82.     Smith, Moyer, LRME and SSI sent the invoices to the Neese parties by email over the internet.

83.     Dated December 1, 2016, that initial invoice to the Neese parties ("the December 2016 invoice") required the Neese parties to pay $28,852.93 for its initial buy-in.  A true and correct copy of the December 2016 invoice is attached to this Complaint as Exhibit 2 and incorporated herein by reference.

84.     Smith, Moyer, LRME and SSI jointly prepared and approved the December 2016 invoice.

85.     The December 2016 invoice purports to show the costs of the Project from its inception ($230,823.42) and the Neese parties' obligation to pay 1/8th of those costs ($28,852.93).

86.     The December 2016 invoice also purports to give a detailed description of the $230,823.42 in total costs. Within that description, the December 2016 invoice lists each of the leases contained in the promotional binder the Neese parties had read and relied upon.  For each of those leases, the December 2016 invoice lists related costs allegedly incurred to obtain and maintain each lease.

87.     The December 2016 invoice constitutes a representation by Smith, Moyer, LRME and SSI that the Neese parties were obtaining a 1/8th fractional interest in the leases listed therein.  Thus, by means of the December 2016 invoice, Smith, Moyer, LRME and SSI were reiterating the false fractional interest representation.

88.     By means of the December 2016 invoice, Smith, Moyer, LRME and SSI were willfully and intentionally concealing the fraudulent nature of the fractional interest representation.

89.     The Neese parties read and reviewed the December 2016 invoice. They reasonably and justifiably understood the December 2016 invoice to state that they were obtaining a 1/8th fractional interest in the leases listed in the invoice.

90.     Justifiably unaware that the fractional interest representation was false, the Neese parties paid the amount of the initial invoice, $28,852.93.  In doing so, the Neese parties justifiably believed that they were purchasing a 1/8th fractional interest in the leases listed in the December 2016 invoice.

91.     Thereafter through the end of March 2017, Smith, Moyer, LRME and SSI prepared and sent to the Neese parties Project invoices.  These invoices continued to falsely represent that the Neese parties owned a 1/8th fractional interest in the oil and gas leases of the Project.

92.     Justifiably unaware that the fractional interest representation was false, the Neese parties paid the amount of these invoices.

**E.     Smith, Moyer, LRME and SSI Repeat the False Fractional Interest Representation to the Neese Parties to Persuade Them to Participate in the Mining Exploration Division of the Project.**

93.     In approximately April 2017, Smith, Moyer, LRME and SSI contacted the Neese parties by email and asked them to participate in the mining exploration division of the Project.

94.     In an effort to persuade the Neese parties to participate in the mining exploration division of the Project, Smith, Moyer, LRME and SSI represented to the Neese parties that if they agreed to participate in the mining exploration division of the Project and pay 1/8th of the costs for the mining exploration, they would obtain ownership of a 1/8th fractional interest in the Project's mining claims on federal land.

95.     At the time they made the foregoing fractional interest representation to the Neese parties in April 2017, Smith, Moyer, LRME and SSI knew that it was false.

96.     As of April 2017, Smith, Moyer, LRME, and SSI knew that in order to actually provide a participant with a fractional interest in the Project's mining claims on federal land, a formal assignment of that fractional interest would have to be signed by Smith, Moyer, LRME or SSI and then formally filed with the BLM and in the state where

the claim is located.

97.    At all times relevant to this case, Smith, Moyer, LRME, and SSI knew that they had no present or future intention, plan to create, execute, or file with the BLM and the state where a claim is located the proper formal assignment of any fractional interest in the Project's mining claims.

98.    Smith, Moyer, LRME and SSI have never provided to any participant in the Project or filed with the BLM or in any state a formal assignment or transfer of any fractional interest in any mining claim of the Project.

99.    Justifiably unaware that the fractional interest representation was false, the Neese parties agreed to participate in the mining exploration division of the Project.

**F.    Smith, Moyer, LRME and SSI Continue to Send Deceptive Invoices to the Neese Parties for the Oil and Gas and Mining Exploration Divisions of the Project.**

100.    Beginning in April 2017, Smith, Moyer, LRME and SSI began to send combined invoices to the Neese parties purporting to reflect the interests of the Neese parties in the Oil and Gas and Mining exploration divisions of the Project.

101.    From April 2017 through February 2021, the Neese parties received no fewer than 37 separate combined invoices from Smith, Moyer, LRME and SSI.

102.    As with the invoices for the oil and gas exploration division, Smith, Moyer, LRME and SSI's purpose in preparing and sending the invoices for the mining exploration division was to induce participants to continue to provide funding to the Project.

103.    The mining exploration section of the invoices purported to identify the expenses of the Project each participant is responsible for, based upon that participant's

percentage interest in the mining exploration division.

104.   The mining exploration section of the monthly invoices was based upon the false assumption and false representation that the participant receiving the invoice had a fractional interest in the  mining claims of the Project.

105.   A fundamental purpose of the mining exploration section of the monthly invoice was to perpetuate the false fractional interest representation and further deceive participants into believing they had fractional ownership interests in the mining claims of the Project.

106.   Each of the 37 monthly combined invoices was a separate misrepresentation to the Neese parties intended to deceive the Neese parties into believing that they owned a fractional interest in the oil and gas leases and mining claims of the Project.

107.   Smith, Moyer, LRME and SSI unlawfully coerced participants to pay the monthly combined invoices for the Project by threatening to terminate their interest in the Project, including the participant's fractional ownership interests, if the participant failed to pay amounts shown on the invoices.  Smith, Moyer, LRME and SSI made these threats to maintain, support, and conceal their fraudulent scheme based upon the fraudulent fractional interest representation.  The threats by Smith, Moyer, LRME and SSI constituted threats of economic harm made with the purpose of obtaining money from Project participants. The threats by Smith, Moyer, LRME and SSI put the participants in reasonable fear of economic harm.

108.   Justifiably believing that they owned a fractional interest of the oil and gas leases and the mining claims of the Project, and justifiably unaware that the fractional

interest representation was false, the Neese parties paid the combined invoices.

109.    Justifiably believing that they owned a fractional interest of the oil and gas leases and the mining claims of the Project, and justifiably unaware that the fractional interest representation was false, the Neese parties paid $334,046.95 to Smith, Moyer, LRME and SSI based upon the monthly invoices.

### G.    Smith, Moyer, LRME and SSI Solicit the Field Parties to Participate in the Mining Exploration Division of the Project.

110.    In early 2017, Smith, Moyer, LRME and SSI contacted Scott Field and discussed the possibility of the Field parties being passive participant investors in the mining exploration division of the Project.

111.    Shortly thereafter in early 2017, Smith, Moyer, LRME and SSI met with the Field parties at Bookcliff Country Club in Grand Junction, Colorado, to discuss the opportunity.

112.    During the meeting, Smith, Moyer, LRME and SSI represented to the Field parties that, if they agreed to participate in the mining exploration division of the Project and pay $1/8^{th}$ of the costs for the mining exploration division, they would become members of the joint venture Project, would share in the upside profits of the mining exploration division, and would obtain ownership of a 1/8th fractional interest in the Project's present and future mining claims on federal land.

113.    At the time they made the foregoing representations to the Field parties in early 2017, Smith, Moyer, LRME and SSI knew that the fractional interest representation was false.

114.    During the Bookcliff Country Club meeting, Smith, Moyer, LRME and SSI provided to the Field parties the October 2016 Land Proposal that had been included in the promotions binder previously given to the Neese parties.

115.    Based on the statements of Smith, Moyer, LRME and SSI during the Bookcliff Country Club meeting and the content of the October 2016 Land Proposal, the Field parties justifiably understood and believed that if they agreed to participate in the mining exploration division of the Project and pay $1/8^{th}$ of the costs for the mining exploration division, they would become members of the joint venture Project, would share in the upside profits of the mining exploration division, and would obtain ownership of a 1/8th fractional interest in the Project's present and future mining claims on federal land.

116.    At the time they made the foregoing fractional interest representation to the Field parties in early 2017, Smith, Moyer, LRME and SSI knew that it was false.

117.    In early 2017, Smith, Moyer, LRME, and SSI knew that in order to actually provide a participant with a fractional interest in the Project's mining claims on federal land, a formal assignment of that fractional interest would have to be signed by Smith, Moyer, LRME or SSI and then formally filed with the BLM and in the state where the claim is located.

118.    At all times relevant to this case, Smith, Moyer, LRME, and SSI knew that they had no present or future intention, plan to create, execute, or file with the BLM and the state where a claim is located the proper formal assignment of any fractional interest in the Project's mining claims.

119.    Smith, Moyer, LRME and SSI have never provided to any participant in the Project or filed with the BLM or in any state a formal assignment or transfer of any fractional interest in any mining claim of the Project.

120.    Justifiably unaware that the fractional interest representation was false, the Field parties agreed to participate in the mining exploration division of the Project.

**H.    Smith, Moyer, LRME and SSI Send Deceptive Invoices to the Field Parties for the Exploration Division of the Project.**

121.    Beginning in April 2017, Smith, Moyer, LRME and SSI began to send invoices to the Field parties purporting to reflect the interests of the Field parties in the mining exploration division of the Project.

122.    Smith, Moyer, LRME and SSI sent the invoices to the Field parties by email over the internet.

123.    From April 2017 through February 2021, the Field parties received no fewer than 40 separate invoices from Smith, Moyer, LRME and SSI for the mining exploration division of the Project.

124.    Smith, Moyer, LRME and SSI's purpose in preparing and sending the invoices for the mining exploration division was to induce the Field parties to continue to provide funding to the mining exploration division of the Project.

125.    The mining exploration monthly invoices purported to identify the expenses of the Project each the Field parties were responsible for, based upon that the Field parties' $1/8^{th}$ interest in the mining exploration division.

126.    The mining exploration monthly invoices were based upon the false

assumption and false representation that the participant receiving the invoice had a fractional interest in the  mining claims of the Project.

127.    A fundamental purpose of the mining exploration monthly invoice was to perpetuate the false fractional interest representation and further deceive participants into believing they had fractional ownership interests in the mining claims of the Project.

128.    Each of the 40 monthly invoices was a separate misrepresentation to the Field parties intended to deceive the Field parties into believing that they owned a fractional interest in the mining claims of the Project.

129.    Smith, Moyer, LRME and SSI unlawfully coerced participants to pay the monthly combined invoices for the Project by threatening to terminate their interest in the Project, including the participant's fractional ownership interests, if the participant failed to pay amounts shown on the invoices.  Smith, Moyer, LRME and SSI made these threats to maintain, support, and conceal their fraudulent scheme based upon the fraudulent fractional interest representation.  The threats by Smith, Moyer, LRME and SSI constituted threats of economic harm made with the purpose of obtaining money from Project participants. The threats by Smith, Moyer, LRME and SSI put the participants in reasonable fear of economic harm.

130.    Justifiably believing that they owned a fractional interest of the mining claims of the Project, and justifiably unaware that the fractional interest representation was false, the Field parties paid the combined invoices.

131.    Justifiably believing that they owned a fractional interest of the mining claims of the Project, and justifiably unaware that the fractional interest representation was

false, the Field parties paid $94,497.04 to Smith, Moyer, LRME and SSI based upon the monthly invoices.

**I.** **Plaintiffs Discover the Fraud of Smith, Moyer, LRME and SSI.**

132.    As a result of ongoing repetition of the false fractional interest representation by Smith, Moyer, LRME and SSI, as alleged above, Plaintiffs were justifiably unaware that the fractional interest representation was false.

133.    On August 26, 2020, the Field parties met in Grand Junction, Colorado, with Moyer, Smith, Larry Terrell (allegedly the CPA for Smith and Moyer), and Jeff Hrncir, an affiliate of the joint venture Project.  During that meeting, Scott Field expressed his concern that the mining exploration division did not seem to be a legal entity and that he and his wife had no way of transferring their assets from the Project into their trust.  Moyer admitted to Scott Field at that time that LRME owned and held all the mining claims.

134.    As a result of the foregoing meeting on August 26, 2020, Plaintiffs became aware that the prior, ongoing fractional interest representation of Smith, Moyer, LRME and SSI was false.

135.    A reasonably diligent plaintiff would not have discovered the falsity of the fractional interest representation of Smith, Moyer, LRME and SSI prior to August 26, 2020.

**J.** **Smith, Moyer, LRME and SSI Conspire With Golden Crest to Unlawfully Transfer Mining Claims of the Project to Golden Crest and Usurp a Business Opportunity of the Joint Venture Project.**

136.    On May 24, 2021, Smith, Moyer, LRME and SSI transferred 241 mining

claims of the joint venture Project to Golden Crest.

137.    Upon information and belief, Plaintiffs allege that other members of the joint venture Project own or control Golden Crest.

138.    Upon information and belief, Plaintiffs allege that the transfer from Smith, Moyer, LRME and SSI to Golden Crest was not an arms-length transaction and was for less than reasonably equivalent value.

139.    But for the fraud of Smith, Moyer, LRME and SSI  in the sale to Plaintiffs of fractional interests in the mining claims of the Project, as alleged herein, Plaintiffs would possess a protectible fractional interest in some or all of the 241 claims Smith, Moyer, LRME and SSI transferred to Golden Crest.

140.    Following Smith, Moyer, LRME and SSI's transfer of the 241 mining claims to Golden Crest, Golden Crest entered into a lease agreement for the 241 mining claims with Solitario Zinc. Corp. ("Solitario"), an opportunity that had been under negotiation between the joint venture Project and Solitario for some time before Golden Crest was formed.

141.    Golden Crest and those members of the joint venture project who own and control Golden Crest have unlawfully usurped a business opportunity of the joint venture Project.

**V.       CLAIMS FOR RELIEF**

**Claims Against Smith, Moyer, LRME and SSI**

**Count One**

**(Securities Fraud: 15 U.S.C. § 78j)**

142.    Plaintiffs incorporate herein all foregoing paragraphs of this Complaint.

143.    Smith, Moyer, LRME and SSI, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce or of the mails, with scienter, (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

144.    By engaging in the conduct described above, Smith, Moyer, LRME and SSI violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.l0b-5.

145.    As a direct and intended result of the foregoing violations by Smith, Moyer, LRME and SSI, Plaintiffs have suffered money damages in excess of $400,000.

Wherefore, Plaintiffs pray for judgment against Smith, Moyer, LRME, and SSI jointly and severally as follows:

A.    Damages in an amount not less than $400,000, to be established at trial;

B.    For Plaintiffs' costs and reasonable attorney's fees; and

C.    For all other relief justified under the circumstances of this case.

### Count Two

### (Securities Fraud: Section 11-51-501, C.R.S. (2020))

146.    Plaintiffs incorporate herein all foregoing paragraphs of this Complaint.

147.    Smith, Moyer, LRME and SSI, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

148.    By engaging in the conduct described above, Smith, Moyer, LRME and SSI violated Section 11-51-501, C.R.S. (2020).

149.    As a direct and intended result of the foregoing violations by Smith, Moyer, LRME and SSI, Plaintiffs have suffered money damages in excess of $400,000.

Wherefore, Plaintiffs pray for judgment against Smith, Moyer, LRME, and SSI jointly and severally as follows:

A.    Damages in an amount not less than $400,000, to be established at trial;

B.    For Plaintiffs' costs and reasonable attorney's fees; and

C.    For all other relief justified under the circumstances of this case.

### Count Three

### (Breach of Fiduciary Duty)

150.    Plaintiffs incorporate herein all foregoing paragraphs of this Complaint.

151.    Smith, Moyer, LRME, and SSI controlled the joint venture Project.

152.    The participant members of the joint venture, including the Neese parties and the Field parties, had no voice in the control and management of the joint venture

Project and relied upon Smith, Moyer, LRME, and SSI to control and manage the affairs of the joint venture Project.

153.    As a result, Smith, Moyer, LRME, and SSI owed the participant members, including the Neese parties and the Field parties, a fiduciary duty.

154.    As alleged herein, Smith, Moyer, LRME, and SSI breached that fiduciary duty.

155.    As a direct and proximate result of that breach of fiduciary duty, the Neese parties and the Field parties have been damaged.

156.    As alleged herein, the conduct of Smith, Moyer, LRME and SSI was fraudulent, malicious, or willful and wanton, justifying the imposition of punitive damages under Section 13-21-102, C.R.S. (2020).

Wherefore, Plaintiffs pray for judgment against Smith, Moyer, LRME, and SSI jointly and severally as follows:

A.    Damages in an amount not less than $400,000, to be established at trial;

B.    Punitive damages in an amount to be established in the sound discretion of the jury;

C.    For Plaintiffs' costs and reasonable attorney's fees; and

D.    For all other relief justified under the circumstances of this case.

### Count Four

### (Common Law Fraud)

157.    Plaintiff incorporates herein all foregoing paragraphs of this Complaint.

158.    As alleged herein, on numerous occasions, Smith, Moyer, LRME and SSI

made a false representation of material fact to the Neese parties and to the Field parties. In particular, that false representation of material fact was the fractional interest representation.

159.   As alleged herein, Smith, Moyer, LRME and SSI knew that the fractional interest representation was false each time they made it.

160.   As alleged herein, the Neese parties and the Field parties were justifiably unaware that the fractional interest representation was false each time Smith, Moyer, LRME and SSI made it.

161.   As alleged herein, Smith, Moyer, LRME and SSI made the false fractional interest representation with the intent to deceive the Neese parties and the Field parties and with the intent that the Neese parties and the Field parties act upon it to their detriment.

162.   As a direct, foreseen, and intended result of the numerous false misrepresentations of material fact, as alleged herein, the Neese parties and the Field parties have been damaged.

163.   As alleged herein, the conduct of Smith, Moyer, LRME and SSI was fraudulent, malicious, or willful and wanton, justifying the imposition of punitive damages under Section 13-21-102, C.R.S. (2020).

Wherefore, Plaintiffs pray for judgment against Smith, Moyer, LRME, and SSI jointly and severally as follows:

A.     Damages in an amount not less than $400,000, to be established at trial;

B.     Punitive damages in an amount to be established in the sound discretion of the jury;

C.     For Plaintiffs' costs and reasonable attorney's fees; and

D.     For all other relief justified under the circumstances of this case.

### Claims Against All Defendants

### Count Five

### (Colorado Organized Crime Control Act)

164.   Plaintiffs incorporate herein all foregoing paragraphs of this Complaint.

165.   The joint venture Project constituted an enterprise ("the enterprise") under Section 18-17-103, C.R.S. (2020), inasmuch as it was an association in fact.

166.   The enterprise functioned as a continuing unit, with an existence separate and apart from the pattern of unlawful activity alleged herein and separate and distinct from those Defendants and persons against whom Plaintiffs allege a claim for participation in the illegal enterprise.

167.   The enterprise functioned as a continuing unit with the common purpose of (a) obtaining oil and gas leases and mining claims on federal land in the western United States; (b) identifying the areas within the leased land and mining claims with the highest potential for oil drilling and mining success; (c) marketing and selling or assigning those high potential areas and claims to outside third-parties to enable those third-parties to drill successful wells and successfully mine minerals; and (d) retaining a financial interest in successful wells and mining claims.

168.   As alleged herein, Moyer, LRME, Smith, and SSI knowingly participated in, managed, and conducted the enterprise, directly and indirectly, through a pattern of racketeering activity, in violation of Section 18-17-104(3), C.R.S. (2020).

169.   Moyer, LRME, Smith, and SSI acted in concert with each other and with Golden Crest in order to carry out the pattern of racketeering activity and did so for financial gain.

170.   The racketeering activity of Smith, Moyer, LRME and SSI under § 18-17-103(5), C.R.S. (2020) consisted of the following predicate acts: (1) securities fraud in violation of Section 11-51-501, C.R.S. (2020); (2) wire fraud in violation of 18 U.S.C. § 1343; and (3) extortion in violation of 18 U.S.C. § 1951.

171.   As to the Neese parties, Smith, Moyer, LRME and SSI engaged in a pattern of racketeering regarding securities fraud under Section 11-51-501, C.R.S. (2020).  Prior to the Neese parties agreeing to join the joint venture Project, Smith, Moyer, LRME and SSI committed at least two prior acts of securities fraud in violation Section 11-51-501, C.R.S. (2020) by soliciting the agreement of at least two other participants to join the joint venture Project by making the false fractional interest representation to each of them. Thereafter, as alleged herein, Smith, Moyer, LRME and SSI committed at least two acts of securities fraud as to the Neese parties, as alleged herein. The first was in connection with the Neese parties' agreement to join the joint venture Project in January of 2017. The second was in approximately April 2017 in connection with the Neese parties' agreement to participate in the mining exploration division of the Project.

172.   As to the Field parties, Smith, Moyer, LRME and SSI engaged in a pattern of racketeering activity regarding securities fraud under Section 11-51-501, C.R.S. (2020). Prior to the Field parties agreeing to join the joint venture Project, Smith, Moyer, LRME and SSI committed the acts of securities fraud referred to in the preceding paragraph. In

addition, as alleged herein, Smith, Moyer, LRME and SSI committed an act of securities fraud in violation Section 11-51-501, C.R.S. (2020) in connection with the Field parties' agreement to join the joint venture Project.

173.    As to both the Neese parties and the Field parties, Smith, Moyer, LRME and SSI engaged in a pattern of racketeering activity regarding mail fraud.  Smith, Moyer, LRME and SSI engaged in no fewer than 77 separate acts of wire fraud in violation of 18 U.S.C. § 1343, as alleged herein.  Smith, Moyer, LRME and SSI transmitted each invoice to the Neese parties and the Field parties by email over the internet. As alleged herein, the use of the invoices by Smith, Moyer, LRME and SSI was part and parcel of their scheme and artifice to defraud the participants in the Project, including the Neese parties and the Field parties, into believing they had obtained fractional interests in the oil and gas leases and mining claims of the Project.

174.    As to both the Neese parties and the Field parties, Smith, Moyer, LRME and SSI engaged in extortion in violation of 18 U.S.C. § 1951. As alleged herein, Smith, Moyer, LRME and SSI unlawfully coerced participants to pay the monthly invoices by threatening to terminate their interest in the Project, including the participant's fractional ownership interests, if the participant failed to pay amounts shown on the invoices.  Smith, Moyer, LRME and SSI made these threats to maintain, support, and conceal their fraudulent scheme based upon the fraudulent fractional interest representation.  The threats by Smith, Moyer, LRME and SSI constituted threats of economic harm made with the purpose of obtaining money from Project participants, including the Neese parties and the Field parties. The threats by Smith, Moyer, LRME and SSI put the participants, including

the Neese parties and the Field parties, in reasonable fear of economic harm.

175.    Smith, Moyer, LRME and SSI committed each of the foregoing predicate acts of racketeering activity for the purpose of financial gain and are punishable by imprisonment for more than one year.

176.    The foregoing acts of racketeering activity were related to each other and to a common organizing principal, including the affairs of the enterprise.

177.    The foregoing acts of racketeering activity have the same or similar purposes, results, participants, victims, and methods of commission and are otherwise interrelated by distinguishing characteristics, as alleged herein.

178.    The acts of racketeering activity, alleged herein, were continuous and exhibited the threat of being continuous.

179.    As alleged herein, the 241 mining claims Smith, Moyer, LRME and SSI transferred to Golden Crest, and the resulting agreement with Solitario, constitute proceeds derived directly or indirectly from the pattern of racketeering activity of Smith, Moyer, LRME and SSI , as alleged herein.

180.    As alleged herein, Golden Crest has used those proceeds, directly or indirectly, in the establishment and operation of the enterprise consisting of Smith, Moyer, LRME, SSI, Golden Crest, and other as yet unidentified persons and/or entities.

181.    Plaintiffs sustained foreseeable injury to their person, business, or property as a direct and proximate result of the foregoing violations of Section 18-17-104, C.R.S. (2020) involving a pattern of unlawful activity, as alleged herein.

Wherefore, the Neese parties and the Field parties each pray for judgment against

Defendants as follows:

A.    For threefold Plaintiffs' actual damages, pursuant to Section 18-17-106(7), C.R.S. (2020);

B.    For Plaintiffs' attorney's fees and costs pursuant to Section 18-17-106(7), C.R.S. (2020);

C.    A money judgment of forfeiture for the amount of the proceeds from the 241 mining claims transferred to Golden Crest and the transaction with Solitario; and

D.    All other relief justified under the circumstances of this case, including all other appropriate relief under Section 18-17-106, C.R.S. (2020);

Dated this 14th day of June, 2021.

_____
Richard R. Thomas, Bar No. 7-5865
SMITH LC
Post Office Box 8729
Jackson, Wyoming 83002
T: 307-201-6000
E: rthomas@smith-lc.com
*Attorneys for Plaintiffs*

## **JURY DEMAND**

Pursuant to Rule 38(b), *Fed. R. Civ. P.*, Plaintiffs demand trial by jury on all issues

so triable herein.

Dated this 14th day of June, 2021.

_____
Richard R. Thomas, Bar No. 7-5865
SMITH LC
Post Office Box 8729
Jackson, Wyoming 83002
T: 307-201-6000
E: rthomas@smith-lc.com
*Attorneys for Plaintiffs*